## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DARNELL MISSOURI  #389199**
    **Petitioner**

                                            **No.2:08-cv-11660**
                                            **HON. ROBERT H. CLELAND**
                                            **UNITED STATES DISTRICT JUDGE**
                                            **HONORABLE DONALD A. SCHEER**
                                            **UNITED STATES MAGISTRATE**

**THOMAS BIRKETT, Warden**
    **Respondent**

### ANSWER IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

    NOW COMES Thomas Birkett, Warden, by Kym L. Worthy, Prosecuting Attorney for the County of Wayne, Timothy A. Baughman, Chief of Research, Training and Appeals, Janet A. Napp, special assistant attorney general, and in opposition to the petition for a writ of habeas corpus say as follows:

*A.  Statement of the Case*

    Petitioner was convicted at a jury trial for assault with intent to murder, first-degree home invasion, discharge of a firearm at a dwelling, felony firearm, and malicious destruction of a building.  Petitioner was sentenced to 200 months to 300 months on the assault conviction, 18 month to 20 years on the home invasion, 18 months to 4 years on the discharge of a firearm conviction, 1 year, 6 months to 5 years on the malicious destruction conviction, and two years on the felony firearm conviction.  Each sentence was to be served concurrently, other than the felony firearm conviction, which was ordered to be served consecutive to the other sentences.

1

At trial, Clifford Gilliam identified Petitioner, whom he knew as "Joe," as the person who broke into his house and assaulted him. Gilliam had seen Petitioner across the street from his house, every day for two or three months, and recalled a time when he came to the house to borrow a plunger. Gilliam described how on April 27th, Chanta Paul, whom he had seen with Petitioner plenty of times, came over his house to use the bathroom. Paul rushed to the bathroom, and she was still in the bathroom when defendant knocked on Gilliam's door, asking to talk to Paul. Gilliam did not unlock the steel door to let him in. Petitioner picked up a chair that was on the porch and threw it through the front window. Petitioner stepped through the window onto the couch in front of the window. He had his foot on the couch and his head through the window. Gilliam picked up a bat and told him not to come in, and that he did not want to crack him in the head with a bat that he had. Petitioner insisted that he was coming into the house, but stepped back. Gilliam did not know that Petitioner had a pistol until defendant backed out onto the porch, reached into his pants, and fired five or six times. The bullets missed Gilliam, but Petitioner shot out the windows and the storm door as Gilliam watched. Petitioner said that he would be back to "burn this motherfucker," and then left. About five minutes later, Gilliam heard a brick being thrown through his bedroom window in the back of the house. Gilliam was not sure where Paul went during the affray. The police arrived about five minutes after that, and Gilliam told them what "Joe" had done. When Gilliam next saw Petitioner standing on the corner, he phoned the police, and Petitioner was arrested. Gilliam denied being drunk or on drugs when the incident occurred.[1]

---

[1] (TT, 9/3/03, 5-21, 24-28, 29-27).

Frank Gaines, Gilliam's neighbor, but not his friend, identified Petitioner as the person whom he saw break into Gilliam's house after hearing a gunshot. Petitioner was someone he had seen in the neighborhood for some time, selling drugs. Gaines saw Petitioner unsuccessfully trying to break down Gilliam's door. He then saw Petitioner take a chair that was on the porch, throw it through the window to break it, step inside, and fire about five gunshots into the house. Gaines heard Gilliam say that he was going to bash Petitioner in the head, and he heard Petitioner threaten to burn the house down. Gaines saw Petitioner leave and run down an alley and then saw Petitioner coming back to Gilliam's house and heard windows breaking. Petitioner again escaped down the alley. Gaines phoned the police.[2]

Chandra Paul, a defense witness, testified that she was with Clifford Gilliam at his home, where they went to get high and to drink, and both were drinking prior to the incident. She testified that Gilliam, a heavy drinker, drank two pints before she left his house. Paul returned to Gilliam's at 1:00 or 2:00 a.m. because she needed to hide from Uche', her drug dealer. Paul admitted that she came to Gilliam's house because she "stole from them."[3] Paul knew Uche' from the neighborhood and she bought drugs from him. She testified that she told Gilliam that Uche' was after her, after which they got high on crack and drunk. Gilliam offered her money for sex, and Paul agreed to have sex with him in a back room for $100.00. Gilliam and Paul went into a back room of the house, and while they were engaging in sex, someone knocked on the bedroom window. Paul said it must be Uche', and asked Gilliam to take a look. Neither Gilliam nor Paul looked to see who knocked at the window. Paul went to the front room, and

---

[2] (TT, 9/3/03, 55-62).

[3] (TT, 9/3/03, 93-95).

3

Gilliam staggered in the hallway. Paul looked out the front window, and saw Uche', admitted taking his stuff, and testified that Uche' said that he would get her. Uche' broke the window with a chair. Paul said that she ran and hid in a closet. Paul denied that Petitioner was the person who threw the chair, testified that she was not at Gilliam's house that night, and that she had not seen him that day.[4]

On cross-examination, Paul admitted telling the police that Petitioner was the man who threw the chair through the window, and that she did not give the police another name. Paul admitted that she knew Petitioner because she bought crack from him, and that she knew Uche' and Petitioner to be "in the same vicinity," although she denied knowing what business they were in. Paul admitted that she bought crack from both Uche' and Petitioner. Paul estimated that about a half hour elapsed between the time she stole the items and when she went to Gilliam's house, but she denied that Uche' was just lucky in finding her at Gilliams' house, and denied telling Uche' that she was taking his stuff and going to Gilliam's. Paul admitted hearing gunshots, and then testified, for the first time, that the man at the window had a gun, and the gun made her run. When questioned about her direct examination that the chair thrown through the window made her run, Paul clarified that she saw the gun first. Paul also testified that she gave the police defendant's name because it was the only "real name" she could think of, and because the police told her they would take her home is she gave them a name.[5]

Bobby Johnson, who knew Petitioner for at least three years, testified that he was with her at the time the crime occurred. Johnson described the events of that day, and said that Petitioner

---

[4] (TT, 9/3/03, 95-100).

[5] (TT, 9/3/03, 100-106, 108).

was with her the entire time. When she fell asleep he was there, and was there when she awoke. There were no signs that he left the house while she slept.[6] On cross-examination, Johnson admitted that she and Petitioner had a sexual relationship, and that she had been dating him for about a year and a half. She admitted that he helped her with her finances and in other ways, and that he could have left when she was asleep without her knowing it, but she did not think so. Johnson admitted contacting Paul on Petitioner's behalf and asking her to testify. She did not contact the police about Paul's prospective testimony. Johnson knew that Petitioner may have "tricked" with Paul, and knew that he sold drugs.[7]

Petitioner's convictions and sentences were affirmed by the Michigan Court of Appeals on February 15, 2005.[8] Leave was denied by the Michigan Supreme Court on July 26, 2005.[9] Petitioner then filed a motion for relief from judgment in the trial court, which was denied in an Opinion dated February 27, 2007. Petitioner followed with a motion for reconsideration in the Circuit Court, which was denied on March 23, 2007. Petitioner's delayed application for leave to appeal in the Michigan Court of Appeals was denied on August 9, 2007, and his application for leave to appeal in the Michigan Supreme Court was denied on January 8, 2008.

In his Petition for Writ of Habeas Corpus, Petitioner raises the following issues:

> I. The cumulative effect of the prosecutor's misconduct denied Petitioner his state and federal rights to a fair trial.

---

[6] (TT, 9/3/03, 117-127).

[7] (TT, 9/3/03, 128-138).

[8] *People v Darnell Missouri,* unpublished opinion per curiam of the Michigan Court of Appeals, issued February 15, 2005 (Docket No. 251307); hereinafter "COA Opinion."

[9] Docket Number 128221.

A. Without benefit of pre-trial notice and the rational for admission, the prosecutor repeatedly injected prejudicial other-acts evidence and innuendo.

B. The prosecutor improperly vouched for the credibility of prosecution witness (Gilliam) and (Gaines).

II: The trial court committed evidentiary error infringing the Fourteenth Amendment right to due process, when it admitted other-acts evidence, over defense objection, before determining that the evidence was relevant and not unduly prejudicial.

III: Ineffective assistance of counsel denied Petitioner a fair trial.

A. Trial counsel failed to object to the improper injection of other-acts evidence.

B. Trial counsel failed to seek the appointment of an expert on identification, or a cautionary instruction on the grave dangers of mis-identification.

C. Trial counsel failed to timely and properly object to the prosecution's misconduct raised in claim I., of this petition.

IV: Petitioner's conviction and sentence must be vacated, due to irreparably and unduly suggestive identification where trial counsel was ineffective for failing to move the court to suppress the identification prior to Petitioner's trial.

V: Petitioner was denied his right to effective assistance of counsel under the Sixth Amendment under state and federal constitution, when counsel failed to object to the in-court identification as well as filing a motion to suppress.

VI. The prosecutor committed reversible error by allowing the prosecutor's witness to testify that holes "appeared" to be bullet holes when there was no evidence to support such theory as well as arguing to the jury that this was the truth and trial counsel was ineffective for failing to object.

VII: Petitioner received ineffective assistance of trial counsel in violation of the Sixth Amendment to the United States Constitution when counsel failed to conduct adequate pre-trial investigation.

VIII: Petitioner's conviction for assault with intent to commit murder must be vacated where the district court abused its discretion by binding Petitioner over for trial, where the prosecutor did not introduce sufficient evidence that Petitioner actually shot at the victim.

IX: Petition was denied his federal constitutional right to a jury trial be sentencing Petitioner on the basis of behavior not proven beyond a reasonable doubt to the jury.

X. Petitioner was denied a fair trial considering the cumulative effect of both prosecution misconduct and ineffective assistance of counsel.

XI: Petitioner received ineffective assistance of counsel on appeal when counsel failed to raise the following issues outlined in Petitioner's petition.

XII: Petitioner asserts that the facts and evidence presented in his Application for Writ of Habeas Corpus establishes a claim of actual innocence.

## B. Bars to Review

### 1. Procedural Bar

Petitioner's first issue, involving the cumulative affect of prosecutorial misconduct, is procedurally defaulted, as defendant failed to timely and specifically object. In its Opinion, the Michigan Court of Appeals applied a plain-error standard of review due to the failure to object, holding that first, the evidence of defendant's involvement with drugs was properly admitted to show bias, and that it did not affect the outcome of the case.[10]  Petitioner's fourth, fifth, sixth,

---

[10] COA Opinion, 1, citing *People v Rodriguez*, 252 Mich App 10, 32; 650 NW 2d 96 (2002) and *People v Callon,* 256 Mich App 312, 329; 662 NW 2d 501 (2003); *Coleman v Thompson*, 501 U.S. 722, 729, 111 S Ct 2456, 115 L Ed 2d 640 (1991)

seventh, eighth, ninth, tenth, and eleventh claims are procedurally barred, as the Michigan Supreme Court refused to consider these issues because Petitioner failed to meet his burden of establishing relief under MCR 6.508(D). Federal habeas review is barred where a State court declines to address a prisoner's federal claims because the prisoner failed to meet State procedural requirements.[11] Here, the Michigan Supreme Court, in an Order dated January 8, 2008, considered the denial of the application for leave to appeal and denied relief "because the defendant has failed to meet the burden of establishing entitlement to relief under MCR. 6.508(D).

*2. Exhaustion*

Petitioner's tenth claim involving cumulative error due to prosecutorial misconduct and ineffective assistance of counsel was not raised in the State courts as a federal claim, and is not characterized in the habeas petition as a federal claim. A habeas petitioner is required to exhaust available state court remedies before seeking habeas corpus relief.[12] To fulfill the exhaustion requirement, a habeas petitioner must present federal claims at each level of the state judicial system, including the state's highest court,[13] and this requires more than merely presenting catchall references to "fair trial" and "due process" within otherwise non–constitutional argument.[14]

---

[11] *Coleman v Thompson*, 501 U.S. 722, 729, 111 S Ct 2456, 115 L Ed 2d 640 (1991)

[12] 28 U.S.C. § 2254(b)(1)(A)

[13] See *Duncan v Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995)

[14] *Blackmon v Booker*, 394 F. 3d 399, 400-401 (2004)

Here, Petitioner cited no federal constitutional provision or case law in his tenth claim, where the claim was issue eight, either in the Michigan Court of Appeals or Supreme Court, or in his habeas petition, where he cites no law at all. To the extent that this Court may now view the claims as federal claims, despite Petitioner's failure to characterize them as such, review is barred because Petitioner has failed to exhaust her state remedies. Additionally, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."[15] Petitioner's cumulative error claim does not state a cognizable claim for habeas relief.

### 3. Mixed petition

Where a petition contains both exhausted and unexhausted claims, it is subject to dismissal,[16] and Petitioner cannot be granted relief, although the unexhausted claims may be denied on the merits.[17] Because the petition contains both exhausted and unexhausted claims, it should be dismissed. In the alternative, and as set forth in the following arguments, the petition should be denied for lack of merit.

### C.  Argument

### 1. *Defendant cannot overcome the State procedural bar*

This Court may address the merits of the issues that are procedurally barred if Petitioner can overcome the burden imposed by the procedural bar. The Supreme Court established a strict

---

[15] *Lorraine v Coyle*, 291 F.3d 416, 447 (6th Cir.), opinion corrected on denial of rehearing, 307 F.3d 459 (6th Cir. 2002)

[16] *Rose v Lundy*, 455 U.S. 509, 522, 102 S.St. 1198, 71 L.Ed.2d 379 (1982)

[17] 28 USC § 2254(b)(2)

test for claims of actual innocence in *Schlup v Delo,*[18] where the court held that a habeas Petitioner must show that a constitutional violation probably caused the conviction of someone who was actually innocent.  To gain review of procedurally defaulted issues under this theory, a Petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence, a stronger showing than prejudice or a reasonable doubt in light of new evidence.[19]

     Here, Petitioner cannot overcome that procedural bar.  Petitioner was largely identified by people who had seen him previously, or whom actually know him.  Clifford Gilliam  clearly identified defendant as the person who broke into his house and assaulted him.  Gilliam had seen defendant across the street from his house, every day for two or three months, and recalled a time when defendant came over to borrow a plunger.  Gilliam knew him as "Joe."  Gilliam described how on April 27th, Paul, whom he had seen with defendant plenty of times, came over his house to use the bathroom.  Paul rushed to the bathroom, and she was still in the bathroom  when defendant knocked on Gilliam's door, asking to talk to Paul.  Gilliam did not unlock the steel door to let him in.  Defendant picked up a chair that was on the porch and threw it through the front window.  Defendant stepped through the window onto the couch in front of the window.  He  had his foot on the couch and his head through the window.  Gilliam picked up a bat and told him not to come in, and that he did not want to crack him in the head with a bat that he had.  Defendant insisted that he was coming into the house, but stepped back.  Gilliam did not know that defendant had a pistol until defendant backed out onto the porch, reached into his pants, and

---

[18] *Schlup v. Delo,*  513 U.S. 298, 315, 115 S.Ct. 851, 861, 130 L ed 2d 808 (1995).

[19] *Schlup v. Delo, Id.,* 513 US  at 327-329.

fired five or six times. The bullets missed Gilliam, but defendant shot out the windows and the storm door as Gilliam watched. Defendant said that he would be back to "burn this motherfucker," and then left. About five minutes later, Gilliam heard a brick being thrown through his bedroom window in the back of the house. Gilliam was not sure where Paul went during the affray. The police arrived about five minutes after that, and Gilliam told them what "Joe" had done. When Gilliam next saw defendant standing on the corner, he phoned the police, and defendant was arrested. Gilliam denied being drunk or on drugs when the incident occurred.[20]

Frank Gaines, Gilliam's neighbor, but not his friend, identified defendant as the person whom he saw break into Gilliam's house after hearing a gunshot. Defendant was someone he had seen in the neighborhood for some time, selling drugs. Gaines saw defendant unsuccessfully trying to break down Gilliam's door. He then saw defendant take a chair that was on the porch, throw it through the window to break it, step inside, and fire about five gunshots into the house. Gaines heard Gilliam say that he was going to bash defendant in the head, and he heard defendant threaten to burn the house down. Gaines saw defendant leave and run down an alley. Gaines ultimately saw defendant coming back to Gilliam's house and heard windows breaking. Defendant again escaped down the alley. Gaines phoned the police.[21]

---

[20] (TT, 9/3/03, 5-21, 24-28, 29-27).

[21] (TT, 9/3/03, 55-62).

11

The evidence presented by the defense was weak, as both Chanta Paul and Bobby Johnson got their drugs from Petitioner, and at least in the case of Paul, her testimony was inconsistent. Additionally, Johnson admitted that some of her finances were tied to defendant.[22]

## 2. *The admission of other acts evidence*

Petitioner claims that other acts evidence was improperly admitted against him at trial. The State Court found, as to the first instance involving Petitioner's selling of drugs, that the issue was both not objected to and properly admitted as evidence of bias.[23] Evidence the bias of a witness is admissible and relevant.[24] Moreover, the admission of evidence under state law is not a recognizable claim under habeas review: "'federal habeas corpus relief does not lie for errors of state law.'"[25]

---

[22] See testimony as cited, *supra.*

[23] This subissue was procedurally defaulted, as Petitioner's claim on appeal, that improper similar acts evidence was admitted against him at trial, differed from the objection raised at trial, which was relevance and prejudicial. (TT, 9/3/03, 102, 138). The State court found the error unpreserved, holding it did not affect the outcome of the case. Additionally, the court found that the prosecutor "properly presented evidence of Petitioner's involvement with drugs to show bias, where defense witnesses had a special interest in his acquittal because they acquired drugs from him." COA Opinion, 1, citing *People v Rodriguez*, 252 Mich App 10, 32; 650 NW 2d 96 (2002) and *People v Callon,* 256 Mich App 312, 329; 662 NW 2d 501 (2003); *Coleman v Thompson*, 501 U.S. 722, 729, 111 S Ct 2456, 115 L Ed 2d 640 (1991)

[24] In *United States v Abel,* 469 US 45, 105 S Ct 465, 83 L Ed 2d 450 (1984), the Supreme Court held that under the Federal Rules of Evidence, it is permissible to impeach for bias. In *Abel,* a witness's testimony about that evidence showing that the membership of both both defendant and the witness in a prison gang whose rules required its members to lie, cheat, steal and kill to protect each other was sufficiently probative of the defense witness' possible bias toward defendant to permit its admission into evidence. *Id.,* 469 US at 49.

[25] *Estelle v McGuire,* 502 US 62, 67, 112 S Ct 475, 116 L Ed 2d 385 (1991), citing *Lewis v Jeffers,* 497 US 764, 780, 110 S Ct 3092, 111 L Ed 2d 606 (1990).

The testimony complained of occurred when Paul testified that she was with Clifford Gilliam, who, along with her, went to Gilliam's house to get high and to drink, and both were drinking prior to the incident. She testified that Gilliam, a heavy drinker, drank two pints before she left his house. Paul returned to Gilliam's at 1:00 or 2:00 a.m. because she needed to hide from Uche', her drug dealer. Paul admitted that she came to Gilliam's house because she "stole from them."[26] Paul knew Uche' from the neighborhood and she bought drugs from him. She testified that she told Gilliam that Uche' was after her, after which they got high on crack and drunk. Gilliam offered her money for sex, and Paul agreed to have sex with him in a back room for $100.00. Gilliam and Paul went into a back room of the house, and while they were engaging in sex, someone knocked on the bedroom window. Paul said it must be Uche', and asked Gilliam to take a look. Neither Gilliam nor Paul looked to see who knocked at the window. Paul went to the front room, and Gilliam staggered in the hallway. Paul looked out the front window, and saw Uche', admitted taking his stuff, and testified that Uche' said that he would get her. Uche' broke the window with a chair. Paul said that she ran and hid in a closet. Paul denied that Petitioner was the person who threw the chair, testified that he was not at Gilliam's house that night, and that she had not seen him that day.[27]

On cross-examination, Paul admitted telling the police that Petitioner was the man who threw the chair through the window, and that she did not give the police another name. Paul admitted that she knew Petitioner because she bought crack from him, and that she knew Uche' and Petitioner to be "in the same vicinity," although she denied knowing what business they were

---

[26] (TT, 9/3/03, 93-95).

[27] (TT, 9/3/03, 95-100).

13

in. Paul admitted that she bought crack from both Uche' and Petitioner. Paul estimated that about a half hour elapsed between the time she stole the items and when she went to Gilliam's house, but she denied that Uche' was just lucky in finding her at Gilliams' house, and denied telling Uche' that she was taking his stuff and going to Gilliam's. Paul admitted hearing gunshots, and then testified, for the first time, that the man at the window had a gun, and the gun made her run. When questioned about her direct examination that the chair thrown through the window made her run, Paul clarified that she saw the gun first. Paul also testified that she gave the police Petitioner's name because it was the only "real name" she could think of, and because the police told her they would take her home is she gave them a name.[28]

Bobby Johnson, who knew Petitioner for at least three years, testified that he was with her at the time the crime occurred. Johnson described the events of that day, and said that Petitioner was with her the entire time. When she fell asleep he was there, and was there when she awoke. There were no signs that he left the house while she slept.[29] On cross-examination, Johnson admitted that she and Petitioner had a sexual relationship, and that she had been dating him for about a year and a half. She admitted that Petitioner helped her with her finances and in other ways, and that Petitioner could have left when she was asleep without her knowing it, but she did not think so. Johnson admitted contacting Paul on Petitioner's behalf and asking her to testify. She did not contact the police about Paul's prospective testimony. Johnson knew that Petitioner may have "tricked" with Paul, and knew that Petitioner sold drugs.[30]

---

[28] (TT, 9/3/03, 100-106, 108).

[29] (TT, 9/3/03, 117-127).

[30] (TT, 9/3/03, 128-138).

The second instance occurred when the prosecutor received a non-responsive answer to the question of whether he knew the Petitioner's name. Gaines responded that he did not know Petitioner's name, but added that he had first noticed Petitioner in the area when he was breaking into a house at the same time that Gaines was coming down the alley.[31] The prosecution admitted on appeal that such testimony was better left unsaid while arguing that the failure of the trial court to suppress this evidence was not decisive of the outcome to the extent that a new trial must be granted.

The State court agreed, holding that it was "unlikely that the error affected the outcome of the case. The comment was brief, and it was not supported by any additional evidence. Given the strength of the eyewitness testimony and the weakness of the defense, Petitioner has failed to sow that it is more likely than not that the evidence affected the outcome of the case."[32]

The State court decision was not objectively unreasonable application of clearly established federal law as decided by the United States Supreme Court. On collateral review, by of a state court criminal conviction by a federal habeas court, the federal court must assess a non constitutional error under the "substantial and injurious" standards announced in *Brecht v*

---

[31] (TT, TT, 9/3/03, 58).

[32] COA Opinion, 1, citing *People v Mateo*, 453 Mich 203, 215; 551 NW 2d 891 (1996), *People v Whittaker,* 465 Mich 422, 427; 635 NW 2d 687 (2001), and *People v Lukity,* 460 Mich 484, 493-494; 596 NW 2d 607 (1999).

15

*Abrahamson.*[33]   Under this standard, an error is harmless unless it " 'had substantial and injurious effect or influence in determining the jury's verdict.' "[34]

Here, the reference by Gaines to first seeing Petitioner breaking into another house was fleeting and direct evidence implicated Petitioner, as more fully explained both *infra* and *supra*.

### 3. *Ineffective assistance of counsel*

Petitioner claims that trial counsel provided him with ineffective representation in three ways.  First, that counsel failed to object to the other acts evidence, and secondly, failed to obtain an expert in identification to challenge the identification.   Finally, Petitioner claims counsel was ineffective for failing to object to the prosecutorial misconduct raised in his first State issue. A review of the claims of error reveal that counsel made no significant errors in that Petitioner was not prejudiced by any errors that were made.

To establish ineffective assistance of counsel, a Petitioner must show: (1) that counsel's performance was below an objective standard of reasonableness under prevailing professional norms; (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different.[35]   In *Strickland* v *Washington*,  the Supreme Court held that the following must be established in order to mandate reversal under a Sixth Amendment claim of ineffectiveness of counsel:

---

[33]  *Brecht v Abrahamson,* 507 US 619; 113 S Ct 1710; 123 L Ed 2d 353,  372 (1993),

[34]  *Brecht v Abrahamson, supra,* 507 US at 631, quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), as quoted in *Fry v Pliler,* 127 S Ct 2321, 2325, 168 L Ed 2d 16 (2007).

[35]  *Bell v Cone,* 535 US 685, 695; 122 S Ct 1843, 1850; 152 L Ed 2d 914 (2002).

> First, the Petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the Petitioner by the Sixth Amendment. Second, the Petitioner must show that the deficient must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Petitioner of a fair trial, a trial whose result is reliable. Unless a Petitioner makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[36]

The Court noted that there is a strong presumption that counsel was effective, and Petitioner must overcome that presumption. The Court further noted that judicial scrutiny must be "highly deferential" and held that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's performance at the time."[37]

The State court found that the failure to object to the bad acts evidence and claim of prosecutorial misconduct did not affect the outcome of the trial, and that counsel's decision to not call an expert in eyewitness identification "was reasonable trial strategy where the two eyewitnesses were familiar with Petitioner, and his own eyewitness told police Petitioner was the one who did the shooting."[38]

---

[36] *Strickland* v *Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

[37] *Strickland v Washington, id.*, 455 US at 689.

[38] COA Opinion, 2, citing *People v Carbin*, 463 Mich 590, 599-600; 623 NW 2d 884 (2001).

The State court decision was not objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.  Petitioner was clearly identified by people who had seen him before and who knew him in some respect.  Gilliam's testimony was very detailed and was supported by Frank Gaines, defendant's neighbor, but not his friend.  As to the defense claim that Gilliam's drinking affected his ability to identify Petitioner, it should be recalled that as detailed, *supra,* two witnesses, Gilliam and Gaines, positively identified Petitioner. Gilliam was very able to identify Petitioner, not only because he knew him from the neighborhood, and Petitioner had come over to borrow a plunger one time, but he was able to see Petitioner up close when Petitioner was straddling his sofa after breaking out the window and coming into the house via the broken window.  As to Gaines, he testified that he had an unobstructed view and the that the lighting was very good because of a street light.  In fact, Gaines watched Petitioner after he left the house.

_____**RELIEF**

WHEREFORE, respondent respectfully requests that the petition for a writ of habeas corpus be denied.

                              Respectfully submitted,

                              **KYM L. WORTHY**
                              Wayne County Prosecuting Attorney

                              **TIMOTHY A. BAUGHMAN**
                              Chief of Research, Training, & Appeals


                              s/ *Jeffrey Caminsky*
                                 Special Assistant Attorney General
                                 Principal Attorney, Appeals
                                 jcaminsk@co.wayne.mi.us
                                  P27258


                              s/ *Janet A. Napp*

                              Special Assistant Attorney General
                              Assistant Prosecuting Attorney
                              1115 Frank Murphy Hall of Justice
                              1441 St. Antoine
                              Detroit, MI  48226
                              (313) 224-5741
                              jnapp@co.wayne.mi.us
                              P-40633

Date:   October 31, 2008

...

### Certificate of Service

I hereby certify that on October 31, 2008, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

> Hon. Robert H. Cleland
> Hon. Donald A. Scheer

and I hereby certify that I mailed by United States Postal Service the papers to the following non-ECF participant:

> Darnell Missouri, #389199
> Standish Maximum Correctional Facility (SMF)
> 4713 West M-61
> Standish, Michigan 48658

**MICHAEL A. COX**
*Attorney General*

**KYM L. WORTHY**
Wayne County Prosecuting Attorney

**TIMOTHY A. BAUGHMAN**
Chief of Research, Training, and Appeals

s/ *Jeffrey Caminsky* (P27258)
*Special Assistant Attorney General*
*Principal Attorney, Appeals*
Wayne County Prosecutor's Office
1116 Frank Murphy Hall of Justice
Detroit, Michigan 48226
Phone: (313) 224-5846
FAX:   (313) 224-8224
jcaminsk@co.wayne.mi.us
P27258

Dated: October 31, 2008